IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:26-cv-217 |
| | ) | |
| APPROXIMATELY 1,070,013.93441 TETHER | ) | |
| ("USDT") CRYPTOCURRENCY SEIZED FROM | ) | |
| CRYPTOCURRENCY DEPOSIT ADDRESSES | ) | |
| ENDING IN 163ACC, BA442F, F8A780, AND | ) | |
| CMB9H2 ON THE TETHER BLOCKCHAIN, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America (hereinafter, "United States") brings this Complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) for violations of 18 U.S.C. §§ 1343, 1956 and 1957.

## THE DEFENDANT *IN REM*

2.      The defendant consists of approximately 1,070,013.93441 Tether ("USDT") cryptocurrency seized on February 17, 2026 from the following cryptocurrency deposit addresses on the Tether blockchain:

      a.      0xbea20a10a25baefd05a0995fa2eba86f20163acc ("Subject Address 1");

      b.      0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f ("Subject Address 2");

      c.      0x5ac70f2e1f5b97d9cfe46ee2623dfa5824f8a780 ("Subject Address 3");

and,

d.     TJbpzm91YiNCvBDzozLjyDNNrb9acmB9H2 ("Subject Address 4").

## JURISDICTION AND VENUE

3.     The United States brings this action *in rem* in its own right to forfeit and condemn the defendant. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.     This Court has *in rem* jurisdiction over the defendant under 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district. Upon the filing of this complaint, the plaintiff requests that the Clerk of Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the plaintiff will execute upon the defendant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this district.

6.     The defendant, as described above, is now, and during the pendency of this action will be, in the jurisdiction of this Court and is being held in a government account maintained by the United States Secret Service ("USSS").

## BASIS FOR FORFEITURE

7.     The defendant is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the seizure and forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property; and 18 U.S.C. § 981(a)(1)(C) which provides for the seizure and forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation

of any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7) and 1961(1)) for violations of 18 U.S.C. § 1343.

## BACKGROUND ON CRYPTOCURRENCY AND VIRTUAL CURRENCY EXCHANGES

h.    Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies such as the U.S. dollar but are generated and controlled through computer software. Bitcoin and Ethereum are currently the most well-known virtual currencies in use.

i.    Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of alphanumeric characters.

j.    Each virtual currency address is controlled using a unique corresponding private key, a cryptographic equivalent of a password needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

k.    Companies known as cryptocurrency "exchanges" may hold the value associated with a customer's cryptocurrency in that exchange's own wallet. Such a wallet is known as a custodial wallet because the exchange is the third-party custodian of the cryptocurrency. Alternatively, a user of cryptocurrency may elect to keep their cryptocurrency in their own wallets (i.e., self-hosted or non-custodial wallets). A custodial wallet is the functional equivalent of a bank holding a customer's cash. Criminals often seek to use exchanges to trade illicitly obtained cryptocurrency for cash.

3

l.      Many virtual currencies publicly record all their transactions on what is known as a "blockchain." The blockchain is essentially a distributed public ledger, run by a decentralized network, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that ever received that virtual currency. It also maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

m.      Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether, widely known as "USDT" is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

n.      Tether, widely known as "USDT," is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin." Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens. Tether is connected to Bitfinex, a cryptocurrency exchange registered in the British Virgin Islands.

o.      USDT is hosted on the Ethereum and Tron blockchains, among others. Ethereum ("ETH") and Tron ("TRX") are cryptocurrencies that are open source, public, have a blockchain, and are distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Ethereum and Tron blockchains, which allows anyone to track the movement.

p.      Smart contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided in the contract's code, without any type

4

of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum and Tron blockchain protocols to maintain transparency. Smart contract technology is one of Ethereum and Tron's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum and Tron blockchains. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction contemplated by a smart contract occurs on the Ethereum and Tron blockchains and is both trackable and irreversible.

q.      Like other virtual currencies, USDT is sent to and received from USDT "addresses." A USDT address is somewhat analogous to a bank account number and is represented as a 46-to 48-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction.

r.      Although the identity of an USDT address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular USDT address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. A virtual currency wallet is a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys. A virtual currency wallet also allows users to send and receive virtual currencies. Multiple addresses can be stored in a wallet.

s.      A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual

5

must use the public address (or "public key") and the private address (or "private key").   A public address is represented as a case-sensitive string of letters and numbers, 26 to 28 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key, the cryptographic equivalent of a password or PIN, needed to access the address.  Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

t.        Although cryptocurrencies such as Tether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an often used means of payment for illegal goods and services.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

## **FACTS**

u.        The facts and circumstances supporting the seizure of the defendant are as follows:

### **Overview**

a.        This investigation began when a victim (Victim 1), who resides within the Middle District of Alabama, reported he had been deceived into depositing funds into a crypto wallet for investment with an investment platform called Goldonline.

b.        On October 9, 2025, USSS Special Agent Michael Prevatt spoke with Victim 1, who provided an overview of an interaction he had with an individual named "Charlotte Picard" ("Picard"). Picard approached Victim 1 with an investment opportunity via a private message on social medial platform LinkedIn. Shortly after introductions on LinkedIn, Picard requested to continue the chat on messaging app WhatsApp. Picard advised Victim 1 that she was an experienced investor and offered to teach Victim 1 how to invest in cryptocurrency.

c.    From March 2025 until October 2025, Picard directed Victim 1 to sign up and deposit funds with what appeared to be an investment platform called Goldonline. Picard also guided Victim 1 when to execute investment purchases and sales, resulting in what appeared to be lucrative profits.

d.    Victim 1's total loss was approximately $2,270,713.03. Crypto tracing confirmed that Victim 1 was deceived into transferring 610.6635711 ETH and 4998.02578 USDT via multiple deposits from his Coinbase wallet to Subject Address 1.

**About Goldonline**

e.    Goldonline has taken steps to appear to be a legitimate business, like filing registration documents with state and federal regulatory agencies. However, Goldonline did not file the documentation with regulatory agencies until months after Victim 1's account was created. For example, Goldonline filed Articles for Corporation with the Colorado Secretary of State on July 17, 2025, and submitted FinCEN registration paperwork as a Money Services Business on July 21, 2025.[1] These filings appear to be an attempt to bolster the credibility of Goldonline for an August 4, 2025 press release wherein Goldonline released copies of these filing documents. Photos of the news release with filing documents are provided below:

---

[1] The information submitted to FinCEN was not verified by FinCEN and only reflects what was submitted by Goldonline.



**Source:** *Goldonline*

*August 04, 2025 13:30 ET*

# Goldonline Launches Next-Generation CFD Trading Platform, Connecting to Global Financial Backbone

New York, NY, Aug. 04, 2025 (GLOBE NEWSWIRE) -- Goldonline Global Ltd. today announced the full launch of its next-generation trading execution system, officially connecting to Equinix NY4, one of the world's top financial data centers. This significant deployment marks a key milestone in Goldonline's construction of critical nodes within the global financial infrastructure network, solidifying its ongoing leadership in the global Contracts for Difference (CFD) market with a more robust technological foundation.



8





Headquartered on Wall Street in New York, Goldonline has focused since its establishment in 2016 on building a "trusted, compliant, and intelligent" global financial trading operating system. The platform offers services across seven categories of CFD assets, including forex, precious metals, energy, commodities, and indices, providing global users with stable, compliant, and low-latency trading services.



Goldonline has received registration approval as a Money Services Business (MSB) from the Financial Crimes Enforcement Network (FinCEN) of the U.S. Department of the Treasury, as well as registration from the U.S. Securities and Exchange Commission (SEC). The company adheres to a development logic of "regulation first, technology as a foundation," strictly implementing international financial compliance policies such as KYC (Know Your Customer) and AML (Anti-Money Laundering).



The upgrade of the trading system and node deployment strictly follows the SEC's core requirements for data security, trading transparency, and anti-manipulation, achieving true synchronization of technology and compliance.

"We are not just building a faster system; we are creating a standard channel for trustworthy global capital clearing."
— Sophia Reed, Vice President of Technology at Goldonline



**Millisecond-Scale Matching and Global Concurrent Trading Support**

The newly released "G-Execution 2.0 System" by Goldonline is fully self-developed, featuring high-concurrency order matching, automatic slippage control, on-chain execution verification, intelligent latency adjustment, and dynamic liquidity switching, significantly enhancing the platform's volatility resistance and execution quality.



After connecting to Equinix NY4, the overall matching speed of the platform has improved by over 40%, with the average order latency now reduced to under 15 milliseconds. Combined with the OneZero Bridge system, Goldonline has established stable direct connections with over ten top-tier liquidity providers globally, achieving deep order books and intelligent price matching, particularly suitable for high-frequency traders and quantitative strategy teams.

Additionally, the new system introduces AI behavior recognition risk control modules and on-chain audit records, providing verifiable audit trails for all transactions and supporting the generation of multi-country regulatory report formats, thus enhancing the platform's regulatory technology capabilities.

f.      Goldonline's website does not provide a means of communication for customers to contact support outside of the virtual chat option that Picard highlighted. There are no customer support telephone numbers, e-mail addresses, or business addresses listed on the Goldonline website. There is minimal language on the Goldonline website outlining methods of deposits, withdrawal timelines, transaction limits, or account ownership. These topics are generally discussed and disclosed by legitimate financial services and businesses. Goldonline does not appear to be a legitimate cryptocurrency exchange, investment business, or financial service.

**The Scheme**

g.      Victim 1 began interacting with Picard on WhatsApp after their initial interaction on LinkedIn in early 2025. Picard initially stated she was an experienced investor and pitched the contact as an investment opportunity for Victim 1. During their introductory chat period, Picard provided several pieces of biographical information about herself. Picard said she was originally from France, and from time to time she occasionally returns to France to visit her parents. Picard said she currently lives in Los Angeles, California. Picard also said she has an aunt who works at Blackrock named Samara.

h.      Victim 1 remained in contact with Picard from March 2025 to October 2025, with Picard offering to teach Victim 1 how to successfully invest. In their WhatsApp chat logs, Victim 1 referred to Picard as "teacher" and Picard referred to Victim 1 as her "student". Picard advised Victim 1 that she was using artificial intelligence (AI) to determine exactly when to buy and sell investments like cryptocurrency and gold. Picard frequently commented on market trends and strategies prior to Victim 1 depositing funds into Subject Address 1. In addition, Picard would send images supporting implied market and investment experience. As an example, Picard sent a video file via WhatsApp appearing to show her trying on a ring and later

11

in the video showing the price tag of the ring, displaying a price of $363,000.00 (see still images below). Picard told Victim 1 she has jewelry like what she was trying on, but she only wears it for special occasions because it is too heavy.





i.     Picard instructed Victim 1 to register and invest with the platform Goldonline, which was initially accessed through the domain glorioil.com. Picard instructed Victim 1 to fund the account through the creation of a Coinbase account. When Victim 1 had problems setting up his Coinbase account, Picard described financial institutions and their security protocols as the "mortal enemies of crypto." Later in their correspondence, Picard provided a new domain for Victim 1 to access his Goldonline account (maugold.com), however she did not explain why the domain had changed. All account information, including user IDs and balances, remained the same on the new domain. The following are excerpts from the WhatsApp chat where Picard directed Victim 1 on how to sign-up for Goldonline:

> *[3/24/25, 11:54:24] Charlotte Picard: Coinbase is a crypto exchange listed on NASDAQ, so it is trustworthy. Its function is to buy crypto and transfer crypto. Onchain is a crypto wallet under Crypto.com. Its function is to store crypto and transfer crypto, and it is also the entrance to Web3.*
>
> *[3/24/25, 11:55:43] Charlotte Picard: The hot spots these days will be BTC and GOLD. Due to the Middle East issue and the BTC March option delivery issue, the market will fluctuate to a certain extent. This also means that there are many good trading opportunities in the market.*
>
> *[3/24/25, 11:57:55] Charlotte Picard: When you encounter any problems during the registration process, you can ask me and let me know after you complete the registration. I will teach you the next step* 😎

*[4/3/25, 10:31:18] Charlotte Picard: OK, if there are no other problems. Will arrive by afternoon. By then, I will take the time to teach you how to have your own trading account and inject funds.*

*[4/3/25, 15:17:26] Charlotte Picard: Now all you need to do is open your Onchain, and I will teach you how to register your own trading account.*

*[4/3/25, 15:23:50] Charlotte Picard: Do you see Search at the top?*

*[4/3/25, 15:24:39] Charlotte Picard: Click Browse Web3*

*[4/3/25, 15:29:37] Charlotte Picard: <attached: 00002915-PHOTO-2025-04-03-15-29-37.jpg>*

*[4/3/25, 15:29:44] Charlotte Picard: m.glorioil.com*

*[4/3/25, 15:32:52] Charlotte Picard: Then you see a Join Now on the page?*

*[4/3/25, 15:34:20] Charlotte Picard: Yes, just click Join Now and follow the steps to complete the registration.*

      j.      The following are screenshots provided by Picard in response to Victim 1's questions during the registration process with Goldonline:

14







k.     Victim 1 created what he believed to be an account with Goldonline, showing a User ID of 42961936. Victim 1 believed he would be depositing funds into a custodial wallet held by Goldonline in his name.

l.     Picard suggested a starting amount between $30,000.00 and $50,000.00, later encouraging him to withdraw more funds from a traditional investment portfolio in Victim 1's name. Initially, Victim 1 was hesitant to contribute the starting amount Picard recommended, but Picard assured him portfolio withdrawals were fast and would only take a few days to complete if he needed the liquidity.

m.     Picard instructed Victim 1 whenever he wanted to deposit funds to invest, he would need to receive the deposit wallet address from Goldonline on the Goldonline website. Once they provided the deposit address for his account, he could transfer the funds from his Coinbase account to his Goldonline account.

n.     When Victim 1 requested the deposit address from Goldonline, he was provided with the wallet address corresponding to Subject Address 1 as his deposit account. During transfers to Goldonline, Victim 1 would complete the transfer and then advise Goldonline the transfer was complete. Goldonline would then verify the transfer and update Victim 1's account balance. The process of Goldonline updating his account balance manually contradicts the idea of the cryptocurrency blockchain's verification of transactions. In a traditional cryptocurrency transfer from wallet to wallet, balances are updated automatically with blockchain verification. There is no need to update the balance amount manually.

o.     The following is an image from Picard directing Victim 1 to contact Goldonline when investing funds. This support link is where Victim 1 interacted with Goldonline regarding any deposits, withdrawals, or account questions:

16



p.      Once the account was funded, Picard directed Victim 1 when to buy and sell investments. Victim 1 saw lucrative returns in the first one to two weeks. Due to the lucrative returns, Victim 1 contributed larger amounts into the Goldonline account. Victim 1's total deposits into Goldonline were approximately $2.2 million USD. The investment balance appeared to grow to approximately $7.86 million USD.

q.      Victim 1 frequently sought clarification from Goldonline regarding deposits, withdrawals, and the wallet address into which he was transferring money. For example, in Goldonline chat logs provided by Victim 1, he asks Goldonline support, "0xbeA20A10A25BAEfD05A0995FA2Eba86F20163ACC. Good evening - just verifying this is the address specific to my USDT funds and no one else shares this address at Goldonline, correct?" Goldonline support replied, "Yes." This contradicts blockchain tracing that shows funds were

transferred out of Subject Address 1 by an unknown person without Victim 1's knowledge after he made deposits into Subject Address 1.

r.    In late September 2025, Victim 1 initiated a $450,000.00 withdrawal from his Goldonline account to his Coinbase wallet and received a notification that the attempted withdrawal flagged a security review of his account. Victim 1 was directed to complete a security quiz via WhatsApp with user Katie3234199011. Goldonline advised Victim 1 he passed his security quiz, however his withdrawal limit for his account was now lowered from $500,000.00 weekly to $50,000.00 weekly and therefore the $450,000.00 withdrawal request was rejected. Victim 1 was advised his withdrawal limit could be raised in the future with additional deposits, transactions and account activity; however, no time frame was provided for that to occur.

s.    On October 7, 2025, Victim 1 initiated a withdrawal from his Goldonline account to his Coinbase Account. Victim 1 received a message from Goldonline stating the withdrawal was rejected for security reasons and his account had been frozen. To rectify the freeze, Victim 1 was instructed to submit his identification and to pay 10% of his total balance (approximately $786,500.33) as a security audit fee. Goldonline advised failure to pay the fee and submit the identification would result in the seizure or confiscation of all funds, as well as releasing his information to major banks and government agencies around the world to "blacklist" him. Victim 1 was given a deadline of October 17, 2025 to comply. The message was received from the email address of info@glorioil.email, which had been previously provided in Victim 1's correspondence with Goldonline.

**Movement of Funds - Subject Address 1**

t.    From May 21, 2025, through September 9, 2025, Victim 1 transferred 610.6635711 ETH and 4998.02578 USDT from his Coinbase account to what he believed was his

18

Goldonline account (Subject Address 1). On August 9, 2025, 375 ETH of Victim 1's funds located in Subject Address 1 were converted to USDT utilizing the 1inch network DeFi Exchange. On August 22, 2025, 168.428188392682 ETH of Victim 1's funds located in Subject Address 1 were converted from USDT utilizing the 1inch network DeFi Exchange. *See* Exhibit A.

u.      Between August 27, 2025, and October 19, 2025, 1,861,443.319032 USDT was transferred from Subject Account 1 to intermediary wallet address ending in 49c9[2]. *See* Exhibit A.

v.      On October 22, 2025, Tether froze the remaining 500,901.901891 USDT in Subject Address 1.

**Movement of Funds - Subject Address 2**

w.      Between September 15, 2025 and September 30, 2025, 899,265.00 USDT was transferred from intermediary address ending in 49c9 to Subject Address 2. *See* Exhibit A.

x.      On October 23, 2025, Tether froze 65,073.402453 USDT in Suspect Address 2, including approximately $51,667.00 of Victim 1's funds.

**Movement of Funds - Subject Address 3**

y.      On September 16, 2025, 171,340.00 USDT was transferred from Subject Address 2 to Subject Address 3. *See* Exhibit A.

z.      On October 19, 2025, approximately $170,105.62 was transferred from intermediary address ending in 49c9 to Suspect Address 3. *See* Exhibit A.

aa.     On October 23, 2025, Tether froze 342,147.00807 USDT in Suspect Address 3, including approximately $323,537.00 of Victim 1's funds.

---

[2] The full address for this wallet is 0xbf105c4d30d6794a30e62655828c3dacb5e149c9.

19

**Movement of Funds - Subject Address 4**

bb.     On September 22, 2025, 101545.00 USDT was transferred from Subject Address 2 to wallet address ending in 2e75[3].

cc.     Thereafter, 101545.006871 USDT was transferred from wallet address ending in 2e75 to Binance (Binance.com) deposit address ending in 0169[4]. Binance provided account history, which included customer information and transaction history. While Victim 1's funds were in Binance, they were kept as USDT, but they were moved from the Ethereum blockchain to the Tron blockchain. After being moved to the Tron blockchain, 101544.006871 USDT was transferred from Binance to intermediary wallet ending in Xv2W[5] where Victim 1's funds were combined with other funds.

dd.     On October 12, 2025, 171889.611996 USDT was transferred from intermediary wallet ending in Xv2W to Subject Address 4.

ee.     On October 23, 2025, Tether froze 161,891.611996 USDT in Subject Address 4, including approximately $101,625.00 of Victim 1's funds.

ff.     On November 3, 2025, United States Magistrate Judge Jerusha T. Adams issued seizure warrants for Subject Accounts 1-4. The warrants were executed the following day.

gg.     On February 17, 2026, Tether sent Defendant 1,070,013.93441 USDT to a wallet held by the USSS.

---

[3] The full address for this wallet is 0x70ce432adf02102d06f22a2b57306c0b38fd2e75.
[4] The full address for this wallet is 0x60fce76b2a6c2a09647124cbc4ab1fa699a90169.
[5] The full address for this wallet is TAdkhZTbrcj1zHMid7QDe8xeSKTqo7Xv2W.

**Additional Information**

hh.     Victim 1's scam also correlates with other IC3 reports. Three additional IC3 reports were found involving similar narratives involving WhatsApp, Goldonline, and Goldonline support demanding a security fee be paid after a withdrawal request. One of these reports submitted by an individual (hereinafter "Victim 2") contained many similarities with Victim 1's experience. Victim 2 is also in his 50s and at the time lived in Dallas, Texas. Victim 2 received a message via LinkedIn from an individual named "Marguarite Picard" ("M. Picard") who wanted to expand her business relationships. Their conversation eventually moved to WhatsApp, where M. Picard advised she wanted to show Victim 2 how to trade crypto.

ii.     M. Picard shared many of the same pieces of biographical information with Victim 2 as were shared with Victim 1. M. Picard told Victim 2 she was originally from France but now lives in Los Angeles, California. M. Picard advised Victim 2 she had family who still lived in Paris, France and she would occasionally need to visit them. M. Picard also advised Victim 2 that she had an aunt who worked at Blackrock named Samara who provided the analysis for her trades.

jj.     M. Picard also directed Victim 2 through the registration process for Goldonline via the glorioil.com domain. Like Victim 1, Victim 2 also saw what appeared to be lucrative gains on his first trades and deposited more funds into Goldonline. Victim 2 initiated a withdrawal from his Goldonline account in June 2025, and his account was frozen for a security review. Victim 2 was instructed by Goldonline support to pay a 30% fee of his total balance (approximately $166,000.00) to unlock his account.

kk.     Similar patterns were discovered when analyzing the movement of each of the victim's funds. The funds were sent from the victims' Coinbase accounts to an intermediary

21

wallet address, where it was exchanged for USDT using the DeFi exchange 1inch network. From there, the funds were transferred to three different intermediary addresses. The intermediary addresses associated with Victim 2's funds have an interaction history with the addresses found in the tracing of Victim 1's funds. Specifically, Subject Address 2 interacted with two of the intermediary addresses found in Victim 2's tracing.

## CLAIM FOR RELIEF

WHEREFORE, the United States prays that the defendant be condemned and forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that the funds constitute or were derived from proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud), and pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that the funds constitute property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering), or is property traceable to such property; that the United States be awarded its costs and disbursements in this action; and for such other and further relief as the Court deems proper and just.

Respectfully submitted this 27th day of March, 2026.

KEVIN P. DAVIDSON
ACTING UNITED STATES ATTORNEY

/s/Russell T. Duraski
RUSSELL T. DURASKI
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Telephone: (334) 223-7280
Facsimile: (334) 223-7106
E-mail:  Russell.Duraski@usdoj.gov

22

## EXHIBIT A

| Date | Transferred From | Transferred To | Amount | Token | Approx. USD Value |
|---|---|---|---|---|---|
| 9/9/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 32.83235918 | ETH | $ 141,638.62 |
| 8/25/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 34.36983339 | ETH | $ 164,522.77 |
| 8/18/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 167.71717022 | ETH | $ 751,799.21 |
| 8/6/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 192.70457928 | ETH | $ 709,507.64 |
| 7/14/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 35.33467593 | ETH | $ 106,538.82 |
| 7/9/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 38.24507976 | ETH | $ 106,183.74 |
| 5/21/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 4998.02578 | USDT | $ 4,999.96 |
| 7/1/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 3.99630524 | ETH | $ 9,940.28 |
| 6/30/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 14.95616601 | ETH | $ 37,426.03 |
| 6/27/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 16.85039262 | ETH | $ 40,840.97 |
| 6/24/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 3.96415008 | ETH | $ 9,680.65 |
| 6/13/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 11.3931673 | ETH | $ 30,042.94 |
| 6/12/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 28.64410072 | ETH | $ 79,475.22 |
| 6/5/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 19.51531757 | ETH | $ 50,937.13 |
| 5/29/2025 | Victim 1's Coinbase Wallet | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 10.14027379 | ETH | $ 27,179.05 |
| 8/9/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0x1111111254eeb25477b68fb85ed929f73a960582 | 375.00 | ETH | $ 1,598,236.02 |
| 8/9/2025 | 1Inch Network | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 1560996.987262 | USDT | $ 1,561,243.47 |
| 8/22/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0x1111111254eeb25477b68fb85ed929f73a960582 | 168.428188392682 | ETH | $ 810,471.10 |
| 8/22/2025 | 1Inch Network | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 796340.196136 | USDT | $ 796,179.34 |
| 8/27/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 149993.250304 | USDT | $ 150,015.86 |
| 9/15/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 299889.041055 | USDT | $ 300,049.05 |
| 9/16/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 199956.009678 | USDT | $ 200,029.58 |
| 9/16/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 199940.017995 | USDT | $ 200,013.58 |
| 9/22/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 559625.00 | USDT | $ 560,073.07 |
| 9/29/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 300000.00 | USDT | $ 300,136.75 |
| 10/19/2025 | 0xbea20a10a25baefd05a0995fa2eba86f20163acc (Suspect Address 1) | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 152040.00 | USDT | $ 152,134.46 |
| 9/15/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 157518.00 | USDT | $ 157,602.04 |
| 9/16/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 13822.00 | USDT | $ 13,827.09 |
| 9/16/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 137518.00 | USDT | $ 137,568.59 |
| 9/21/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 100000.00 | USDT | $ 100,049.03 |
| 9/21/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 42857.00 | USDT | $ 42,878.01 |
| 9/22/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 200000.00 | USDT | $ 200,160.13 |
| 9/22/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 226031.00 | USDT | $ 226,211.98 |
| 9/30/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 8000.00 | USDT | $ 8,004.52 |
| 9/30/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 13519.00 | USDT | $ 13,526.64 |
| 9/16/2025 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 0x5ac70f2e1f5b97d9cfe46ee2623dfa5824f8a780 (Suspect Address 3) | 171340.00 | USDT | $ 171,403.04 |
| 10/19/2025 | 0xbf105c4d30d6794a30e62655828c3dacb5e149c9 | 0x5ac70f2e1f5b97d9cfe46ee2623dfa5824f8a780 (Suspect Address 3) | 170000.00 | USDT | $ 170,105.62 |
| 9/22/2025 | 0x0f1cf1ee1ee08a0c29668867360b72ef82ba442f (Suspect Address 2) | 0x70ce432adf02102d06f22a2b57306c0b38fd2e75 | 101545.00 | USDT | $ 101,626.30 |
| 9/22/2025 | 0x70ce432adf02102d06f22a2b57306c0b38fd2e75 | 0x60fce76b2a6c2a09647124cbc4ab1fa699a90169 | 101545.006871 | USDT | $ 101,626.31 |
| 9/22/2025 | TNXoiAJ3dct8Fjg4M9fkLFh9S2v9TXc32G | TAdkhZTbrcj1zHMid7QDe8xeSKTqo7Xv2W | 101544.006871 | USDT | $ 101,625.31 |
| 10/12/2025 | TAdkhZTbrcj1zHMid7QDe8xeSKTqo7Xv2W | TJbpzm91YiNCvBDzozLjyDNNrb9acmB9H2 (Suspect Address 4) | 171889.611996 | USDT | $ 172,160.48 |



GOVERNMENT EXHIBIT

A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY )

## VERIFICATION

I, Michael Prevatt, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Secret Service, that I have read the Verified Complaint for Forfeiture *in Rem* and know the contents thereof, and that the matters contained therein are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the United States Secret Service.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct this 25th day of March, 2026.

_____
Special Agent, Michael Prevatt
United States Secret Service

Sworn to and subscribed before me this 25th day of March, 2026.

_____
Notary Public
Commission Expires: __8·21·29__

23